**[J-83-2019] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 1 WAP 2019 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 14, |
| | : | 2018 at No. 1995 WDA 2014, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Court of Common Pleas of |
| | : | Westmoreland County entered |
| DENNIS ANDREW KATONA, | : | November 10, 2014 at No. CP-65- |
| | : | CR-0002549-2011 |
| Appellant | : | |
| | : | ARGUED: October 15, 2019 |

## DISSENTING OPINION

**JUSTICE DONOHUE**                    **DECIDED: OCTOBER 21, 2020**

The Commonwealth received a consensual wiretap order that purported to authorize unlimited in-home recordings in Katona's residence pursuant to Section 5704(2)(iv) of the Wiretap Act, 18 Pa.C.S. § 5704(2)(iv), for a period of thirty days. I would find that this order was illegal as the plain language only authorized one intercept. My learned colleagues in the Majority avoid this aspect of the case by holding that any illegality in that order and its attendant intercepts was irrelevant under the Independent Source Doctrine due to the absence of "willful misconduct" or "malfeasance" on the part of the police. That conclusion rests on an application of *Commonwealth v. Henderson*, 47 A.3d 797 (Pa. 2012), a case not cited by the court below nor the parties herein in their

principal briefs.[1] While I agree that whether the doctrine applies presents a question of law, Majority Op. at 13 n.10, as developed below I am unconvinced that *Henderson* definitively resolves this case. I would limit our examination to the question presented on appeal, which asked only whether the Superior Court's application of the Independent Source Doctrine was consistent with *Commonwealth v. Melendez*, 676 A.2d 226, 231 (Pa. 1996). The answer is no. And because I would conclude that the wiretap order was illegal, I would reverse the order of the Superior Court.

## I. Background

As the Majority aptly recounts, in 2009 the Pennsylvania State Police ("PSP") began working with a CI who was a member of the Irwin Chapter of the Pagan Motorcycle Club. On May 16, 2011, the CI was at Katona's home when Katona offered to sell him a half-pound of cocaine for $5,000, for which the CI could pay later that evening. The CI agreed, left Katona's residence with the contraband, and immediately turned it over to the PSP. Later that day, the Commonwealth, represented by the Office of the Attorney General, applied for and received a consensual wiretap order that allowed for unlimited intercepts within Katona's home for a period of thirty days. Relying on this order, the PSP sent the CI into Katona's home on multiple occasions over the next thirty days. At each visit, the CI wore a recording device and used pre-recorded money to pay for contraband he received from Katona. The PSP surveilled Katona's home during these visits and met

---

[1] *Henderson* is cited and discussed in an amicus brief, which argues that *Henderson* was inapplicable because "the police officers who discovered the constitutionally tainted evidence are the same ones who purport to rely on independent evidence in applying for a search warrant." Amicus Brief of Public Defender Association of Pennsylvania at 27. In Katona's reply brief, he argued that in *Henderson* "there were two searches with two separate search warrants. It is nothing like our situation." Katona's Reply Brief at 13. The Commonwealth did not cite the case.

with the CI immediately upon his departure to obtain the recordings. The majority of these interactions occurred in Katona's residence, and at all times the CI recorded their conversations. Based on information gathered from these transactions, Trooper Matthew Baumgard obtained a search warrant for Katona's residence based on, inter alia, interviews with the CI, the results of multiple controlled buys, surveillance, and retrieval of the recording device used by the CI. *See generally* Majority Op. at 24-29.

Katona argued that the Wiretap Act only authorized the first recording. Because the search warrant was based on information obtained from all of the recorded conversations, Katona argued that the search warrant was invalid and sought suppression of the items recovered, which included cocaine and methamphetamine. Katona also sought suppression of the recordings themselves, again on the basis that they were obtained in violation of the Wiretap Act.[2] The trial court denied the request for

---

[2] Katona also challenged the recordings that occurred outside of Katona's residence as violative of Section 5704(2)(ii) of the Wiretap Act, *see* Omnibus Pre-Trial Motion, 3/22/2012, at 5-6, which provides that

> Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in Section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:
>
> * * *
>
> (ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be initiated, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however, such interception shall be subject to the recording

suppression.  Katona argued on appeal that Section 5704(2)(iv) uses the term "interception" in the singular and therefore an order issued thereunder authorizes only one intercept.  *See Commonwealth v. Katona*, 191 A.3d 8, 15 (Pa. Super. 2018) (en banc), *appeal granted*, 200 A.3d 8 (Pa. 2019).  He argued that construction was in accord with *Commonwealth v. Brion*, 652 A.2d 287 (Pa. 1994), wherein this Court established that citizens have an expectation of privacy in conversations that occur in their homes, and that such conversations may not be intercepted without a prior determination of probable cause by a neutral judicial authority.  *Id.* at 289.  The General Assembly effectively codified our holding in *Brion* by enacting Section 5704(2)(iv).  In Katona's view, interpreting Section 5704(2)(iv) to authorize more than one recording was akin to allowing multiple executions of a single search warrant, and thus, every recording beyond the first amounted to an unconstitutional search.  191 A.3d at 15.[1]  As relevant to the Majority's resolution of this case, the Commonwealth argued that, even if the interceptions were invalid, the officers' observations and the information relayed to the officers by the CI without any reference to the recordings themselves established probable cause, thus providing an independent, untainted source for the information that established the probable cause.  *Id.*

The Superior Court relied on a distinction not raised by the parties.  The Superior Court acknowledged that *Brion* established a "reasonable expectation of privacy that a

---

and record keeping requirements of Section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom.

18 Pa.C.S. § 5704(2)(ii).

citizen will not be recorded by his guests, and therefore the actual recordings are subject to suppression." *Id.* at 20. The en banc panel noted that *Brion* did not speak to whether the information captured on the recordings, i.e. the words themselves, were subject to suppression. The Superior Court then turned to a subsequent decision from this Court, *Commonwealth v. Rekasie*, 778 A.2d 624 (Pa. 2001), as evidence for the "crucial distinction" between the use of a recording as substantive evidence versus reliance on information captured on the recording to obtain a search warrant. *Katona*, 191 A.3d at 20. In *Rekasie*, this Court rejected the federal principle that no expectation of privacy exists in information disclosed to another, and instead clarified that a constitutional analysis under Article I, Section 8 requires a broader consideration of both the person's actual expectation of privacy and whether society recognizes that expectation as reasonable. *Id.* at 20-21 (discussing *Rekasie*, 778 A.2d at 629-31).[3] The Superior Court concluded that the present case presents an issue not addressed by *Brion* or *Rekasie*: whether a defendant is entitled to suppression of the substance of a conversation that took place in his home, assuming arguendo that the simultaneous recording of the conversation violated the defendant's Article I, Section 8 rights. *Id.* at 22. The Superior Court concluded that although Katona had a reasonable expectation that his in-home conversations with the CI would not be recorded, he had no reasonable expectation of privacy in the substance of those conversations. *Id.* Katona "took the risk that the CI was

---

[3] Concurring in the decision reached in *Rekasie*, former-Chief Justice Castille emphasized that the Court did not consider whether the substance of the telephone conversations was subject to suppression, but only whether the recording itself is subject to suppression, and further explained that in his view, this distinction was significant because there is no expectation of privacy in information disclosed in conversation with another, absent a recognized privilege. *Katona*, 191 A.3d at 21-22 (discussing *Rekasie*, 778 A.2d at 633-34).

acting on behalf of the Commonwealth," *id.* at 23, and therefore nothing prevented the Commonwealth from using the contents of the conversations in the search warrant application.

The court recognized that evidence that is potentially suppressible may be admissible where the Commonwealth can prove that it was discoverable through an independent source. *Id.* (citing *Commonwealth v. Santiago*, 160 A.3d 814, 827 (Pa. Super. 2017), *aff'd*, 209 A.3d 912 (Pa. 2019)). It concluded that Katona's voluntary disclosures to the CI qualified as the independent source of information, and, further, that the search warrant "did not rely upon evidence derived from an unlawful wiretap, but rather the information disclosed to the authorities, which happened to also be recorded." *Id.* In other words, it could not be presumed that the Commonwealth obtained its evidence due to the recordings because "the Commonwealth knew the same information with or without the recordings." *Id.* Thus, it found that the trial court properly denied Katona's suppression motion. *Id.* at 24. Having reached this conclusion, the Superior Court declined to address the substance of Katona's challenge to the validity of the wiretap order. *Id.* at 16.

We granted Katona's petition seeking allowance of appeal to review two issues: (1) whether the Superior Court's application of the Independent Source Doctrine conflicts with our decision in *Melendez*, and (2) whether the § 5704(2)(iv) consensual wiretap order permitting interceptions for a period of thirty days was legal. *See Commonwealth v. Katona*, 200 A.3d 8 (Pa. 2019) (per curiam).

## II. Katona Prevails on Question as Presented

The parties limit their arguments to the question as presented and accepted by this Court. Katona contends that the Superior Court's holding conflicts with *Commonwealth v. Mason*, 637 A.2d 251 (Pa. 1993), and *Melendez*, which required "true independence" when the Independent Source Doctrine is involved, with that term defined in terms of full investigative separation. Katona argues that such separation is not present here because the CI and PSP were part of the same "team." Katona's Brief at 17. Katona argues that "any post interception discussions with the CI about the conversations, assuming such discussions occurred, represent exploitation of the initial illegality." *Id.* at 22. Addressing the Superior Court's assertion that the independent source was Katona's voluntary disclosures to the CI, Katona states that the CI was acting as an agent of the police. Thus, the CI's authority to concurrently learn of the information via Katona's voluntary disclosures cannot be divorced from the in-home recordings. Katona argues that applying the Independent Source Doctrine to the voluntary disclosures is akin to citing the consent exception to justify an illegal search if a suspect consented following an illegal warrantless entry. The legal acquisition of Katona's words cannot be divorced from the illegal recordings.

The Commonwealth responds that *Melendez* should be read against its facts – the seizure of physical evidence, which occurred "only once and by only one means." Commonwealth's Brief at 11. The Commonwealth finds the present case more analogous to *Commonwealth v. Santiago*, 209 A.3d 912 (Pa. 2019), which involved "law enforcement's acquisition of … information rather than physical evidence." *Id.* The Commonwealth argues that pursuant to *Santiago*, when the evidence at issue is of a non-

physical nature, the critical inquiry is whether the challenged evidence was obtained by exploitation of the initial illegality or by means "sufficiently distinguishable to be purged of the taint" of the initial illegality. *Id.* at 13. Thus, according to the Commonwealth, the standards and application of the Independent Source Doctrine differ depending on whether the evidence[4] at issue is tangible or intangible. *Id.* at 12-13. Where, as here, the intangible information evidence is obtained via two sources - one legal (debriefing the CI) and the other not (the recordings) – the Commonwealth contends that *Santiago* instructs that suppression is not warranted, absent a showing that the legal source was procured through an exploitation of the illegality. *Id.* at 13-14.

Addressing the parties' arguments on their terms, I would hold that Katona is entitled to relief. Katona's argument heavily relies on *Melendez* and *Mason*, cases that examined the application of the Independent Source Doctrine under Article I, Section 8. Significantly, those cases declined to follow the United States Supreme Court's approach to the Independent Source Doctrine under the Fourth Amendment as established in *Murray v. United States*, 487 U.S. 533 (1988). *Murray* resolved the question of whether evidence seen in plain view upon an illegal entry could be lawfully recovered through a valid search warrant issued after the illegal entry. In *Murray*, federal agents were surveilling Murray and his co-conspirators. They observed Murray and another man drive vehicles into a warehouse, with the two men leaving about twenty minutes later. Some officers continued to watch the warehouse while others followed the vehicles. Murray

---

[4]   The Commonwealth uses the term "evidence" in this context to refer to the conversations recorded by the CI as distinguished from the physical evidence of drugs that occurred following execution of the search warrant which was based, in part, on the informational "evidence." *See* Commonwealth's Brief at 11 n.3.

and his companion turned the vehicles over to other drivers, who were arrested. A search of the vehicles recovered marijuana. Upon learning this, the agents watching the warehouse entered and observed "numerous burlap-wrapped bales that were later found to contain marijuana." *Id.* at 535. That search was unconstitutional and the agents did not seize the evidence. Instead, they exited and kept the warehouse under surveillance while other agents sought a warrant. That warrant, which did not mention the illegal entry or anything learned upon the entry, was then executed and resulted in seizure of the bales plus other evidence.

The *Murray* Court held that the illegal entry did not require suppression of the bales on the basis that their recovery was separately justified by execution of the warrant as an independent source. Its analysis on that point was tied to the high Court's narrow view of the exclusionary rule. A Fourth Amendment violation is complete when the unlawful seizure or search occurs and suppression is not a constitutional right of the aggrieved party. As a result, the exclusionary rule is designed "to safeguard Fourth Amendment rights generally through its deterrent effect . . . ." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Because suppressing evidence leads to the exclusion of evidence of guilt, whether the exclusionary rule should apply reflects an exercise in weighing costs and benefits. On one side of the ledger is the costs to society engendered by suppressing evidence. On the other is the need to give the exclusionary rule teeth by ensuring that police officers are not rewarded for performing unconstitutional searches.

The United States Supreme Court's development of the Fourth Amendment's exclusionary doctrine places a heavy emphasis on the costs side of the equation. As far as the Court is concerned, "[t]he exclusionary rule exists to deter police misconduct."

*Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056, 2063 (2016) (citation omitted). And the Court has made clear that it exists **only** for that purpose. "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236 (2011). Indeed, the high Court has stated that but-for causality "is only a necessary, not a sufficient, condition for suppression." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). When weighing costs and benefits the question of whether an officer will be deterred is only one part of the equation; the issue of whether exclusion outweighs the costs must still be analyzed.

Because deterrence is the only purpose recognized by the high Court, the *Murray* Court's remedial analysis considered only whether suppressing the evidence would have deterred the officers from conducting the illegal entry that resulted in their knowledge of the bales. The petitioners asserted that applying the Independent Source Doctrine as an exception to exclusion would incentivize officers to make an illegal entry to see if incriminating evidence is actually there. If so, they could get a warrant; if not, they would save time and expense. The Court disagreed, emphasizing that the illegal entry still posed risks:

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it. Nor would the officer *without* sufficient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.

*Id.* at 540 (internal citation omitted).

As indicated by the reference to convincing a magistrate, a limitation on the Independent Source Doctrine is that the purportedly independent source must be "in fact a genuinely independent source of the information and tangible evidence at issue[.]" *Id.* at 542. The *Murray* Court remarked that the warrant would not have been genuinely independent if (1) the decision to seek the warrant was prompted by what the agents observed during the illegal entry or (2) if information obtained during the illegal entry was presented to the magistrate and affected the decision to issue the warrant.[5] *Id.* If neither condition is present, the evidence should not be suppressed because to do so would put the police in a worse position than if no irregularity had occurred.

*Murray* required only "genuine" independence as opposed to "true" investigative independence as the two searches in *Murray* were conducted by a joint task force consisting of agents from both the Federal Bureau of Investigation and Drug Enforcement Agency. *Id.* at 545 (Marshall, J., dissenting). The development of "true" independence through *Melendez* and *Mason* is critical to Katona's challenge. This Court initially followed *Murray* in *Commonwealth v. Brundidge*, 620 A.2d 1115 (Pa. 1993), a case raising only a Fourth Amendment claim. But in *Mason* and *Melendez*, both of which involved Article I, Section 8 claims, we suggested, if not held, that "true" independence was required under our constitution. Requiring that degree of independence as a necessary condition of applying the Independent Source Doctrine under Article I, Section 8 resulted from this Court's markedly different view of what the Pennsylvania Constitution requires when

_____

[5] *Murray* remanded to the Court of Appeals with directions to remand to the District Court for further fact finding on whether the officers would have sought a warrant had they not entered the warehouse earlier. 487 U.S. at 543.

analyzing whether evidence should be suppressed. That point was explicitly made in *Mason*.

In *Mason*, police were surveilling a residence as part of an undercover drug investigation and used a CI to arrange a purchase from Kenny Mitchem. Mitchem went into a particular apartment and, twelve minutes later, came out and got in a car with the CI and an undercover officer. Mitchem was arrested and informed the police that more cocaine was present in the apartment "and that other persons were present making illegal transactions." 637 A.2d at 252. Based on this information and observations from their surveillance, one officer left to obtain a search warrant for the residence while other officers remained to continue surveillance. Before the officer could return with the warrant, a member of the surveillance team broke down the door to the residence with a battering ram. He testified at a suppression hearing that he feared word of Mitchem's arrest would reach the apartment and result in loss of evidence. *Id.* at 252-53. The officers knocked for two minutes to no avail. They then used a battering ram and saw Mason run into a bathroom with her hands in the toilet bowl, having flushed the toilet. During a search of the apartment to ensure no one else was present, they observed drugs and drug paraphernalia in plain view. Once the warrant arrived, the police searched the residence, discovering more drugs, paraphernalia, and other indicia of drug trafficking.

We held that suppression was required based on a violation of Mason's Article I, Section 8 rights. Preliminarily, we acknowledged that if Mason's claim were made under federal law we would be constrained to find that suppression was not warranted. *Id.* at 254. Mason prevailed under the Pennsylvania Constitution because Article I, Section 8

also protects the privacy of individuals and ensures that warrants issue only upon probable cause.

> If our sole purpose in applying Article I, Section 8 to the facts of this case were to deter police misconduct, we would be constrained to rule in favor of the Commonwealth, for in balancing the interests, it is apparent that society's interest in arresting those guilty of serious crime should not be thwarted where police would inevitably and independently arrive at the same evidence, but for their illegal conduct.
>
> However, where our task is not merely to deter police misconduct, but also to safeguard privacy and the requirement that warrants shall be issued only upon probable cause, our conclusion is different. Where the police battering ram is at the door, without exigent circumstances and without a warrant, it is plain that the violent shattering of the door constitutes an unconstitutional invasion of privacy of which every person in this Commonwealth may complain. The requirement that warrants shall issue only upon probable cause means nothing if police are free to batter down the doors of persons who imagine themselves to be secure in their own houses.

*Id.* at 256. In connection with this analysis, we said that Article I, Section 8 prioritizes privacy higher than the need to secure convictions.

> The ultimate distinction, then, between the federal and the Pennsylvania analysis is not that the federal courts seek only to deter police misconduct and the Pennsylvania courts seek to protect certain rights, but that the federal courts place less importance than do we on the right of privacy. Therefore, they balance the interests differently and reach a different conclusion as to the relative importance of privacy as against securing criminal convictions.

*Id.* at 257 n.3.

Justice Cappy concurred, expressing his view that this Court should go further and declare that the Independent Source Doctrine would apply only in "extraordinarily specific circumstances[,]" *id.* at 258 (Cappy, J., concurring), which he deemed not present in *Mason.* Justice Cappy feared that an expansive application of the doctrine would

encourage officers to send for a warrant then make an illegal entry. "[E]very police officer in this Commonwealth could rightfully conclude that if he or she first sent for a warrant based upon probable cause, and that warrant were ultimately issued, no evidence seized as a result of an illegal early entry and search without the warrant, would *ever* be suppressed." *Id.* at 257.

We adopted that principle in *Melendez*. In that case, multiple police officers surveilled the defendant's residence while another officer typed up an application for a search warrant. *Melendez*, 676 A.2d at 227. Meanwhile, the defendant exited her residence, entered a vehicle, and drove away. *Id.* The police immediately stopped her and removed her from the car. A search of her purse revealed a handgun, a large amount of cash and a paper tallying drug sales. *Id.* The officers took Melendez to her home and used her keys to enter the residence. *Id.* As they entered, the officers observed a man holding a bag of cocaine. They then secured the residence and waited for the search warrant. After an hour-long wait, the search warrant was issued. The police then searched the residence and recovered drugs, drug paraphernalia, and money among other evidence. *Id.*

The Commonwealth argued that the inevitable discovery rule applied.[6] We applied the Independent Source Doctrine as analyzed in *Mason* and elected to adopt the limitation

---

[6] We stated that "[t]he inevitable discovery rule, sometimes referred to as the 'independent source rule,' is that if the prosecution can demonstrate that the evidence in question was procured from an independent origin, such evidence is admissible." *Melendez*, 676 A.2d at 230. The *Murray* Court explained that "[t]he inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray v. United States*, 487 U.S. 533, 539 (1988).

set forth by Justice Cappy's *Mason* opinion. It was "clear that we place a greater importance on privacy under the Pennsylvania Constitution than have recent federal cases under the United States Constitution, and we noted that the facts in *Mason* were importantly different from the facts in previous independent source cases in that they involved the invasion of a dwelling place." *Id.* at 231. We concluded that

> The Pennsylvania Constitution does not allow police intrusions exemplified by this case and *Mason.* Government agents may not enter private dwellings through the use of battering rams as in *Mason,* or by effecting illegal stops and seizures as in this case, and secure the premises by detaining those who occupy the premises while police wait to learn whether their application for a warrant has been approved. It is difficult to imagine practices more inimical to the fundamental idea that no person shall be subject to unreasonable searches and seizures.

*Id.* at 231–32.

Applying *Mason* and *Melendez* as the parties herein ask us to do, I would find that Katona prevails. The *Melendez* test requires that a source be independent from **both** the tainted evidence **and** the police who engaged in the misconduct. Even accepting that the first requirement is met, the second requirement plainly is not. The CI was not independent from the officers who engaged in the misconduct because he indisputably acted as an agent of the PSP in his interactions with Katona. Because *Melendez* requires dual independence of the source from both the tainted evidence and the police, even if the CI's description of his conversations with Katona could be deemed to be "truly independent" of the recordings the Independent Source Doctrine would still not apply due to the CI's role as an agent of the PSP.[7]

---

[7] The parties dispute whether the CI relayed the substance of his conversations with Katona to the PSP. The Commonwealth contends that the CI recounted his

Additionally, as previously noted, *see* supra at n.1, *Henderson* was discussed by Katona only in his reply brief, arguing that *Henderson* is distinguishable because it involved two separate search warrants. I agree. *Mason*, *Melendez*, *Henderson*, and *Murray* all involved two actual searches that recovered the **same** evidence, with one of the searches being illegal or otherwise incapable of justifying the recovered evidence. In those cases, the analysis asks whether the second search was an independent source of the same evidence notwithstanding the illegality of the other search. Here, however, the Superior Court held, and no one has challenged, that all of the information learned via Katona's voluntary disclosures were **not** searches because he had no reasonable expectation of privacy in what he told the CI. *See Commonwealth v. Fulton*, 179 A.3d 475, 487–88 (Pa. 2018) ("A search occurs when police intrude upon a constitutionally

conversations to the PSP. *See* Commonwealth's Brief at 14. Katona states that the affidavit of probable cause included multiple paragraphs outlining each instance in which the CI entered Katona's residence while wearing the recording device, but argues that in all but one of these paragraphs there is no direct mention of any statements made by the CI to the PSP. *See* Affidavit of Probable Cause, 6/29/2011, at 15-20.

The fact that the affidavit of probable cause references the recordings at all poses barriers to applying the Independent Source Doctrine. Unlike the Majority, I find it impossible to determine whether the officers decided to seek a warrant based on what they heard on the recordings versus what the CI told them. Finely parsing the affidavit of probable cause to answer that question is an exercise in futility. The very fact that the recordings are mentioned in the affidavit at all signals to the issuing authority that the recordings corroborated everything that the CI observed and told the officers. In addition to stating that the troopers recovered the recording device from the CI at the end of each incident, the affidavit states that the recordings corroborate the allegations. *See* Affidavit of Probable Cause, 6/29/2011, at 16 at ¶ 33 ("On each of these occasions the payment of the money to Katona by the CI was captured by the recording;) *id.* at ¶ 34 ("These amounts were verified on the recording."). Mentioning that the events discussed in the affidavit are all on tape and that portions were confirmed suggests to the magistrate that all of the information is accurate; it would be a foolhardy officer who made representations that he or she knows will be contradicted by objective evidence that will be subject to discovery. In this respect, the recordings served to establish the reliability of the CI by improper means.

protected area without the individual's explicit or implicit permission."). Thus, Independent Source Doctrine cases are something of a doctrinal mismatch from the outset when examining the search warrant as the Majority does. There is simply no second search that resulted in acquisition of the same physical evidence.

Turning to the Commonwealth's argument that this case is resolved by *Santiago*, I disagree. *Santiago*, a case decided solely on Fourth Amendment grounds, began with an officer engaged in a traffic stop. In the midst of the traffic stop, the suspect suddenly sped away, injuring the officer and leaving behind a cell phone. *Santiago*, 209 A.3d at 915. The police recovered the cell phone and searched it, discovering the name "Angel Santiago," which they then used to obtain a photo of a man with that name. *Id.* When shown the photograph, the injured officer identified the individual as Santiago. An arrest warrant was then issued, and Santiago was arrested and charged with a number of crimes. *Id.* Santiago sought suppression of the officer's anticipated in-court identification, arguing that pursuant to Fourth Amendment protections, any identification made by the officer would be the product of the warrantless, and therefore unconstitutional, search of his cell phone. *Id.* at 915-16. The trial court granted suppression, reasoning that but for the illegal search of the cell phone, Santiago would not have become a suspect. *Id.* at 916.

The Superior Court reversed, and we granted appeal to consider whether the fruit of the poisonous tree doctrine required suppression of an in-court identification by a police officer who observed the defendant prior to an illegal search of the defendant's cell phone. *Id.* at 919. Tracing the development of the fruit of the poisonous tree and Independent Source Doctrines under federal law, this Court identified the salient inquiry as "whether,

assuming the primary illegality has been established, the challenged evidence has been obtained by exploitation of that illegality, or instead, by means sufficiently distinguishable to be purged of the taint of the primary illegality." *Id.* at 924. Applying that standard, we held that an identification made entirely as a result of an illegality (such as a warrantless search) taints the identification and renders it inadmissible, but that an eyewitness identification, based on observations that are made prior to and independent of the subsequent illegal conduct, may be admissible. *Id.* at 929.

The Commonwealth reads *Santiago* to stand for the proposition that when the evidence at issue is non-physical in nature, the applicable inquiry is whether the challenged evidence was obtained by exploitation of the initial illegality or by means "sufficiently distinguishable to be purged of the taint" of the initial illegality. Commonwealth's Brief at 13. However, the challenge in *Santiago* was raised only under the Fourth Amendment, and so our consideration in that case did not include the heightened Article 1, Section 8 privacy protections. As discussed, Article 1, Section 8 provides a broader protection of the right to privacy than does its federal counterpart and our application of the Independent Source Doctrine is thus more circumscribed.[8]

---

[8] Additionally, the nature of the contemporaneous acquisition of the knowledge, i.e. the conversations, and making recordings of those conversations, further distinguishes the case from *Santiago*. In that case, the discarded phone led to Santiago's name. Here, the information learned by the CI did not separately lead to additional information. The voluntary disclosures were concurrent with the recording of that information. In *Murray*, the high Court stated that "[k]nowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply." *Murray v. United States*, 487 U.S. 533, 541 (1988). Here, there was no "later acquisition" of the knowledge.

### III. *Henderson* does not apply

The Majority does not answer the question as presented and analyzed hereinabove. Nor does the Court wholly embrace the Superior Court's distinction between information, i.e. what Katona told the CI, versus the search that resulted under *Brion* when those conversations were recorded. *See* Majority Op. at 31 n.18. Instead, the Majority finds that the question on which we granted review was incomplete by adding the following language: "whether the Superior Court's application of the Independent Source Doctrine conflicts with our decision in *Melendez*, **as refined by *Henderson***." *See* Majority Op. at 20 ("[T]his Court has occasionally refined the contours of the Independent Source Doctrine's applicability in this Commonwealth to account for novel factual circumstances in claims arising under our state charter."). The Majority finds that "the parties and the Superior Court in this case have all overlooked" *Henderson*. *Id.*

*Henderson* is part of our jurisprudence and I agree that we must apply the law as we have developed it. However, I disagree with the premise that "*Henderson* is dispositive of this matter." *Id.* The Majority interprets *Henderson* to hold that the "true independence" requirement still exists under Article I, Section 8, but is limited to cases like *Mason* and *Melendez*, i.e., cases involving "willful misconduct" or "malfeasance." Respectfully, I submit that *Henderson* does not lend itself to the construction applied by the Majority. To the extent that *Henderson* could be interpreted in the manner suggested by the Majority, I would defer consideration of that question to a case in which that point is subject to focused advocacy. Nothing prevents this Court from remarking that the applicability of *Henderson* was not briefed by the parties. But because the Majority has

opened that door, I respond to demonstrate that it is not at all clear that *Henderson* governs this case.

The *Henderson* Court was concerned that the *Mason/Melendez* holdings swept too broadly; we were "unwilling to enforce a 'true independence' rule in the absence of police misconduct and on pain of the Commonwealth being forever barred from obtaining non-evanescent evidence connecting [Henderson] with his crimes." *Henderson*, 47 A.3d at 804. Henderson was suspected of rape and kidnapping, and authorities sought his DNA sample for comparison with genetic material recovered from the victim and a vehicle used in the abduction. *Id.* at 798. A member of the police sexual assault unit, Detective Johnson, prepared an affidavit of probable cause, obtained a warrant, and collected samples of the defendant's blood, hair and saliva. Based on the results, the defendant was arrested and charged with multiple felonies. *Id.* When the defendant filed a motion to suppress on the basis that Detective Johnson's affidavit was insufficient to establish probable cause, the Commonwealth decided to invoke the Independent Source Doctrine, as defined by the *Melendez* rule, to obtain a second warrant. *Id.* To that end, a different detective from the same sexual assault unit, Detective Evans, was assigned to conduct a probable cause investigation. Detective Evans spoke with Detective Johnson and reviewed the department's existing case file, interviewed a witness, reviewed the victim's medical records, and conducted an investigation into the defendant's background. Based on information gleaned from these sources, Detective Evans applied for and obtained a second warrant authorizing a second blood draw.

The defendant attempted to secure suppression of the second blood draw. Citing Detective Evans' reliance on information from Detective Johnson and materials obtained

in connection with the first warrant, the defendant argued that the second warrant was not based on information obtained from an independent source, and therefore retained the taint of the illegality that infected the originally-seized evidence. *Id.* Following a hearing, the trial court denied suppression, finding that Detective Evans' investigation was sufficiently separate from the initial investigation such that there was no "causal nexus" between the first blood draw result and the affidavit of probable cause Detective Evans submitted in connection with his warrant application. On appeal, the Superior Court affirmed and we granted review.

The Commonwealth did not argue to this Court that Detective Evans' investigation met the "true independence" standard, and the majority agreed. "No one could seriously contend that Detective Johnson's and Evans' investigations were 'truly independent' under a conventional understanding of those words, where the two conferred about the case and the latter worked directly from the case file previously maintained by the former." *Id.* at 804. *But see id.* at 810 (Todd, J., concurring) (criticizing majority for "truncat[ing] the *Mason/Melendez* rule in a sweeping and protective fashion" and opining that the teams were truly independent). The *Henderson* Court elected to apply the federal *Murray* standard, which we declared "strikes the appropriate balance between privacy and law enforcement." *Id.* at 805. The Majority holds that the same *Murray* balancing approach applies here by discerning a wholesale "refinement" of the Independent Source Doctrine as a result of *Henderson*. *See* Majority Op. at 24 (asserting that *Henderson* "confirms the continued viability of the *Melendez* requirements but limits their application to cases of 'willful misconduct' or 'malfeasance'").

The Superior Court's invocation of the Independent Source Doctrine is ostensibly correct under *Henderson* in that there is no suggestion that the police engaged in any kind of misconduct, let alone egregious. But I do not interpret *Henderson* to foreclose a "true independence" requirement in this circumstance where the focus of Katona's complaint--a violation of an Article I, Section 8 right recognized by *Brion* under the Pennsylvania Constitution--simply has no parallel under the Fourth Amendment. If the unlimited intercept order violated the Wiretap Act, then Katona's Article I, Section 8 rights were repeatedly violated. Yet no relief is forthcoming because the Majority holds that the officers could have secured the same evidence even without the recordings. But the fact remains that the authorities chose to encroach on the Article I, Section 8 rights guaranteed by *Brion*. Article I, Section 8, unlike the Fourth Amendment, stands as a bulwark against such privacy invasions by requiring suppression as the price to pay for the mistaken belief that the unlimited intercept order was valid. At most, *Henderson* holds that the "true independence" rule does not **always** apply when an Article I, Section 8 claim is raised. That should not be confused with the proposition that it **never** applies except in cases of "willful misconduct" or "malfeasance."[9] Without briefing on this point, we should not go beyond the arguments presented.

Moreover, language in *Henderson* indicates that it did not announce a per se rule that police misconduct is absolutely required before demanding "true independence."

---

[9] Applying *Henderson*'s logic, it is unclear why the Court even left those vestiges except as perhaps a concession to stare decisis. The reason for *Melendez* and *Mason*'s departures from the *Murray* standard was grounded in this Court's different cost-benefits approach to the exclusionary rule and did not rely on labels like "willful misconduct" or "malfeasance." Police misconduct was certainly a reason to require "true independence," but the Majority mistakenly reads *Henderson* to announce that misconduct is the **only** condition triggering the higher Article I, Section 8 analytical framework.

*Henderson* denounced the *Melendez* prophylactic per se rule of always requiring "true independence" by observing that "the experience with broadly stated prophylactic rules often has been that they cannot be sustained on their original terms." *Id.* at 803. It is hardly logical, though, to interpret a criticism of a prophylactic rule inuring to the detriment of the Commonwealth as creating a per se rule that always operates to the Commonwealth's benefit. *Cf. Commonwealth v. Gary*, 91 A.3d 102, 138 (Pa. 2014) (Saylor, J., concurring) (observing the "inconsistency in the courts' rejection of bright-line rules restraining law enforcement as a means of protecting individual rights, while simultaneously embracing such rules when they facilitate law enforcement," and arguing for "some clear and appropriate boundaries operating in both directions") (footnote omitted). I fail to see why *Henderson* should be read to replace one per se rule with another, especially where the substituted prophylactic rule operates to the benefit of law enforcement at the cost of individual privacy rights, which is precisely the type of balancing that Article I, Section 8 rejects. *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991) ("The history of Article I, Section 8 . . . indicates that the purpose underlying the exclusionary rule in this Commonwealth is quite distinct from the purpose underlying the exclusionary rule under the 4th Amendment[.]"); *Mason*, 637 A.2d at 257 n.3 ("[F]ederal courts place less importance than we do on the right of privacy. Therefore, they balance the interests differently and reach a different conclusion as to the relative importance of privacy as against securing criminal convictions."); *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010) ("Article I, § 8 of the Pennsylvania Constitution . . . generally provides greater protection than that provided by the Fourth Amendment, because the core of its exclusionary rule is grounded in the protection of privacy while the

federal exclusionary rule is grounded in deterring police misconduct.") (quotation marks and citation omitted); *Commonwealth v. Britton,* 229 A.3d 590, 611 n.8 (Pa. 2020) (Wecht, J., concurring) (explaining that "we have reaffirmed that privacy, rather than deterrence, is the primary reason for our exclusionary rule") (collecting cases).

I add that in other circumstances in which this Court found it preferable to adopt a federal approach across-the-board, we made our intentions in that regard explicit. *See Commonwealth v. Gary*, 91 A.3d 102, 138 (Pa. 2014) (OAJC) ("Therefore, we hold that, in this Commonwealth, the law governing warrantless searches of motor vehicles is coextensive with federal law under the Fourth Amendment."). *Henderson* contains no similar pronouncement that *Murray* always applies in all circumstances other than willful misconduct or malfeasance. In fact, the *Henderson* Court indicated that the particular factual circumstances mattered a great deal:

> In the present circumstances, we are unwilling to enforce a "true independence" rule in the absence of police misconduct and on pain of the Commonwealth being forever barred from obtaining non-evanescent evidence connecting Appellant with his crimes. In answer to the specific question presented, we hold that suppression is not required on account of Detective Evans' status as a member of the same police department as Detective Johnson. Rather, in light of the factual circumstances before the Court in both *Melendez* and *Mason,* we deem it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct. Where such malfeasance is not present, we agree with the superior Court that the *Murray* standard strikes the appropriate balance between privacy and law enforcement. Ultimately, we believe the "twin aims" of Article I, Section 8— namely, the safeguarding of privacy and enforcement of the probable-cause requirement—may be vindicated best, and most stably, by taking a more conservative approach to the departure this Court has taken from the established Fourth Amendment jurisprudence.

*Id.* at 804–05 (footnote and citation omitted).

"In the present circumstances" suggests that the holding is not as broad as indicated by the later language. Clearly, the pronouncement "we deem it appropriate to limit the independent police team requirement to situations in which the rule prevents police from exploiting the fruits of their own willful misconduct," is more expansive than the limitation suggested by "the present circumstances." But for all the foregoing reasons I hesitate to read such language as embracing the expansive rule discerned by the Majority, particularly given the fact that its interpretation of *Henderson* adopts, in direct tension with this Court's Article I, Section 8 jurisprudence, the federal balancing of privacy rights against the societal interest in securing convictions except in extreme circumstances. We should not be so quick to read the opinion so expansively. *See Commonwealth v. Resto*, 179 A.3d 18, 22 n.3 (Pa. 2018) ("Judicial opinions are frequently drafted in haste, with imperfect foresight, and without due regard for the possibility that words or phrases or sentences may be taken out of context and treated as doctrines. . . . No court . . . is obliged to treat a dictum of another court (or, for that matter, its own dicta) as binding precedent.") (quoting *Maloney v. Valley Med. Facilities, Inc.*, 984 A.2d 478, 490 (Pa. 2009)).

Finally, *Mason* and *Melendez* themselves rested on the discrete facts of the cases and not on generic classifications like "willful misconduct" or "malfeasance." For instance, in *Mason* the Court was troubled by the use of a battering ram to enter a home. In *Melendez*, we determined that "Melendez was not engaged in any activity at the time she was stopped which would cause a person of reasonable caution to believe that she was then engaged in criminal conduct," 676 A.2d at 228, and we further found that her consent to go back and search the apartment was invalid. "Government agents may not enter

private dwellings through the use of battering rams as in *Mason,* or by effecting illegal stops and seizures as in this case. . . .". *Id.* at 231. Additionally, in terms of incentives and deterrence, whether the officers were already in the process of obtaining a warrant was a relevant factor. *Mason*, 637 A.2d at 257 n.2 (Cappy, J., concurring) ("As the officers in the case sub judice sent for the warrant prior to their initial illegal entry of the house, there was no risk of a 'search first, pursue warrant later' mentality"); *Murray*, 487 U.S. at 549 (Marshall, J., dissenting) ("The warrant was obtained immediately after the illegal search, and no effort was made to obtain a warrant prior to the discovery of the marijuana during the illegal search."). The Majority's extension of *Henderson* strips the ability of a reviewing court to weigh the factual circumstances. "The proper scope of the independent source exception, and guidelines for its application, cannot be divined in a factual vacuum; instead, they must be informed by the nature of the constitutional violation and the deterrent effect of exclusion in particular circumstances." *Murray*, 487 U.S. at 545 (Marshall, J., dissenting). *Cf. Davis v. United States*, 564 U.S. 229, 254 (2011) ("The Court's 'good faith' exception (unlike, say, inevitable discovery, a remedial doctrine that applies only upon occasion) creates 'a categorical bar to obtaining redress' in *every* case pending when a precedent is overturned.") (internal citation omitted). Applying the Independent Source Doctrine should be a fact-bound inquiry and is poorly served by the bright-line rule adopted and applied by the Majority today.

Indeed, this case demonstrates the danger in reflexively applying the federal exclusionary rule's purpose without any consideration of the underlying privacy right at stake. Unlike *Henderson* this case involves a pure Article I, Section 8 claim because the Fourth Amendment does not recognize the relevant privacy interest that was violated by

the illegal wiretap order. Curiously, then, the *Mason*/*Melendez* rule, and its concomitant application of Pennsylvania's departure from the high Court regarding the exclusionary rule, will **not** apply in the arena where its application is needed the most. Moreover, applying *Henderson* under these circumstances would severely diminish the force of *Edmunds*, which refused to adopt the "good faith" exception to the exclusionary rule under Article I, Section 8.[10] That issue is present here insofar as there is little doubt that the officers acted with an objectively reasonable belief that the judicial court order was lawful. If the good faith exception applied in this Commonwealth there is little chance that Katona would prevail. But it does not apply. Consider the following argument in favor of affirming the Superior Court:

> It should also be remembered that there is a social cost to employment of the exclusionary rule, which is intended to deter police misconduct. Application of the doctrine results in the inadmissibility of certain evidence, and the potential release of the guilty. Thus, the fruit of the poisonous tree doctrine, as an aspect of judicial "supervision" of police practices, has always necessitated a delicate balance. Here, the police sought and were granted a court order authorizing an in -home recording, meaning they had sought and were operating under what they believed to be valid authorization for their activities. The observed or anticipated pattern of rogue and/or bad faith conduct on the part of the police that this Court was clearly so intent on stamping out in *Melendez* through its restrictive interpretation of the independent source doctrine is therefore not present here. The appropriate balance would be struck by holding that the informant's legal

---

[10] The Superior Court has held that precise pleading is outcome determinative when Article I, Section 8 offers a remedy that the Fourth Amendment does not. *Compare Commonwealth v. Carper*, 172 A.3d 613, 618 (Pa. Super. 2017) (declining to apply good faith exception to warrantless blood draw conducted before decision in *Birchfield v. North Dakota*, ⸺ U.S. ⸺, 136 S.Ct. 2160 (2016) where Article I, Section 8 claim is raised) *with Commonwealth v. Updike*, 172 A.3d 621, 623 (Pa. Super. 2017) (applying good faith exception under federal law to permit evidence of blood draw conducted before *Birchfield*; claim under Pennsylvania Constitution waived). In this case, Article I, Section 8 was always at issue because this case involved an application of *Brion*.

and credible recounting of what he saw and heard inside Katona's home, combined with the other evidence spelled out in the search warrant affidavit of probable cause, provided a proper, Constitutional basis for the issuance of the search warrant, regardless of whether any consensual audio recordings were made inside the home or not. To hold otherwise would confer undue benefit on a perpetrator of illegal activities and impose an unfair penalty on law enforcement and, by extension, society.

Commonwealth's Brief at 22-23 (citation omitted).

A clearer invitation to simply ignore *Edmunds* is difficult to imagine. And the Majority is regrettably enticed by this kind of thinking. *See* Majority Op. at 26 ("[I]t is . . . hard to see precisely how the police engaged in any misconduct whatsoever when they were operating pursuant to a court order; if anything, as in *Henderson*, the 'error' here was 'judicial'…"). That is just an alternative way of saying that the officers acted in objective reliance on the court order and should not be punished for their mistake. The Commonwealth violated Katona's Article I, Section 8 privacy rights by unlawfully recording conversations in his home. Exclusion of the evidence is the price that must be paid to protect those privacy rights.[11]

I would therefore apply the "true independence" requirement of *Melendez* to give life to *Brion*'s recognition that "[i]f nowhere else, an individual must feel secure in his ability to hold a private conversation within the four walls of his home. For the right to privacy to mean anything, it must guarantee privacy to an individual in his own home." *Brion*, 652

---

[11]  There is also a deterrent effect if the evidence is suppressed, as authorities would know in the future that this Court will require suppression if authorities lose their roll of the dice when they violate Article I, Section 8 rights. As discussed infra, the plain text of the Wiretap Act establishes that only one in-home recording was authorized. The fact that the authorities did not have to violate the Wiretap Act is why the evidence should be suppressed.

A.2d at 289.  The evidence must be suppressed to protect those rights.  "Although the exclusionary rule may place a duty of thoroughness and care upon police officers and district justices in this Commonwealth, in order to safeguard the rights of citizens under Article I, Section 8, that is a small price to pay, we believe, for a democracy."  *Edmunds*, 586 A.2d at 906.

**IV.**

In light of its disposition, the Majority declines to address whether the order authorizing unlimited in-home intercepts for thirty days was illegal under the Wiretap Act.  A predicate of the foregoing discussion is that the order was, in fact, illegal.  I therefore set forth my analysis of this issue.

**A.      Legality of the Duration of Wiretap Order
Issued Pursuant to 18 Pa.C.S. § 5704(2)(iv)**

*The Parties' Arguments*

Katona argues that the Wiretap Act does not permit an order, issued pursuant to Section 5704(2)(iv), to authorize the interception of multiple communications over a period of thirty days.  Katona's Brief at 44-45.[12]  All references in Section 5704(2)(iv) are to the singular "interception," which, Katona argues, indicates that our General Assembly never contemplated "anything more than a single conversation being intercepted" by a Section 5704(2)(iv) order.  *Id.* at 45.  Further, because orders issued pursuant to Section 5704(2)(iv) may not issue absent a probable cause determination by a neutral judicial

---

[12]  Katona also challenges the Order as violative of his Article I, Section 8 rights.  *See* Katona's Brief at 43.  This Court will not reach a question of constitutional dimension if the case can be resolved on a non-constitutional basis.  *Commonwealth v. Foster*, 214 A.3d 1240, 1247 n.8 (Pa. 2019).  Because I would resolve this issue based upon statutory interpretation, I do not address the constitutional aspect of Katona's argument.

authority, Katona analogizes such an order to search warrants. He contends that just as a search warrant may be executed one time, a Section 5704(2)(iv) order permits the interception of one conversation. *Id.* at 35, 39, 42. Katona allows that the Commonwealth may have "confused" the process to obtain a Section 5704(2)(iv) order with the process to obtain a non-consensual wiretap order, as non-consensual wiretap orders are permitted, by statute, to be effective for a thirty-day duration. *Id.* at 34-35.

The Commonwealth responds that there is no specific statutory requirement that the order be renewed for separate conversations. It contends that "[t]he suspect's interests are suitably protected by the requirement [of] a finding of probable cause, and the issuing judge retains the power to limit the timeframe for interception as he or she sees fit." Commonwealth's Brief at 26. The Commonwealth contends that because here, the affidavit of probable cause established a "long-running and then-ongoing pattern of joint criminal activity[,]" the totality of the circumstances suggest that the incriminating conversations would continue over time. *Id.* The fact that Katona "fronted" the drugs to the CI and expected payment in intervals meant "by definition' that their criminal interactions would continue. *Id.* In the absence of an express statutory restriction, the Commonwealth suggests that we should interpret the statute to allow courts the discretion to determine the duration of a Section 5704(2)(iv) order. *Id.*

*Analysis*

The interpretation of a statute is a question of law, over which our standard of review is de novo and our scope of review is plenary. *Whitmoyer v. Workers' Comp. Appeal Bd. (Mountain Country Meats)*, 186 A.3d 947, 954 (Pa. 2018). Our analysis is guided by the Statutory Construction Act, which instructs that our over-arching goal is to

discern and give effect to the General Assembly's intent. 1 Pa.C.S. § 1921(a). In pursuit

of this goal, we must attempt to give meaning to every word and provision of the statute.

*Whitmoyer*, 186 A.3d at 954. In so doing, we construe all provisions with reference to

each other and do not examine the language at issue in isolation. *Commonwealth v.*

*Foster*, 214 A.3d 1240, 1247-48 (Pa. 2019). This Court has long recognized that as a

matter of statutory interpretation, "although one is admonished to listen attentively to what

a statute says; one must also listen attentively to what it does not say." *See, e.g.*, *Kmonk-*

*Sullivan v. State Farm Mut. Auto. Ins. Co.*, 788 A.2d 955, 962 (Pa. 2001). Furthermore,

because the Wiretap Act emphasizes the protection of constitutionally-recognized privacy

rights, its provisions are to be strictly construed. *Commonwealth v. Spangler*, 809 A.2d

234, 237 (Pa. 2002).

The purpose of the Wiretap Act is to protect the privacy rights of our citizens while

also providing an investigative tool for law enforcement authorities. *Karoly v. Mancuso*,

65 A.3d 301, 303 (Pa. 2013). Subchapter B of the Wiretap Act governs the interception

of wire, electronic, and oral communications.[13] As enacted in 1978, the subchapter began

with Section 5703, which made it a third-degree felony if a person, inter alia, "intentionally

intercepts, endeavors to intercept, or procures any other person to intercept or endeavor

to intercept any wire, electronic or oral communication." 18 Pa.C.S. § 5703(1). Section

5704 then set forth a large number of exceptions (now eighteen) to the general prohibition

in Section 5703. As initially enacted, none of the exceptions in Section 5704 required an

order of court to conduct interceptions. Of relevance here, the second exception listed in

---

[13] Other subchapters address the use of other modes of surveillance, such as mobile tracking devises, pen registers, trap and trace devices, and telecommunication identification interception devices. *See* 18 Pa.C.S. §§ 5741-5775.

5704 originally provided that an interception could take place if one of the parties to a communication consented to the interception (sometimes referred to as "consensual interceptions"):

> (2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:
>
> * * *
>
>> (ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be initiated, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however, such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom;

18 Pa.C.S § 5704(2)(ii).

The 1978 enactment also included Section 5708, which permits the interception of communications without consent of any party to the communication ("nonconsensual interceptions"). Section 5708 authorizes the Attorney General or a district attorney, or their designees, to "make written application to any Superior Court judge for an **order** authorizing the interception of a wire, electronic or oral communication" to "provide evidence aiding in the apprehension of the perpetrator or perpetrators of any of the following offenses." 18 Pa.C.S. § 5708 (emphasis added). Section 5708 then lists a

substantial number of offenses under the Crimes Code, the Tax Reform Code of 1971, the Controlled Substance, Drug, Device, and Cosmetic Act, and the Motor Vehicle Chop Shop and Illegally Obtained and Altered Property Act.

To obtain a court order for a nonconsensual intercept under Section 5708, the 1978 version of Subchapter B also included Sections 5709 ("Application for order"),[14]

---

[14] Section 5709 provides in relevant part as follows:

Each application for an order of authorization to intercept a wire, electronic or oral communication shall be made in writing upon the personal oath or affirmation of the Attorney General or a district attorney of the county wherein the suspected criminal activity has been, is or is about to occur and shall contain all of the following:

(1) A statement of the authority of the applicant to make such application.

(2) A statement of the identity and qualifications of the investigative or law enforcement officers or agency for whom the authority to intercept a wire, electronic or oral communication is sought.

(3) A sworn statement by the investigative or law enforcement officer who has knowledge of relevant information justifying the application, which shall include:

(i) The identity of the particular person, if known, committing the offense and whose communications are to be intercepted.

(ii) The details as to the particular offense that has been, is being, or is about to be committed.

(iii) The particular type of communication to be intercepted.

(iv) A showing that there is probable cause to believe that such communication will be communicated on the wire communication facility involved or at the particular place where the oral communication is to be intercepted.

(v) The character and location of the particular wire communication facility involved or the particular place where the oral communication is to be intercepted.

(vi) A statement of the period of time for which the interception is required to be maintained, and, if the character of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular statement of facts establishing probable cause to believe that additional communications of the same type will occur thereafter.

(vii) A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed, or reasonably appear to be unlikely to succeed if tried or are too dangerous to employ.

18 Pa.C.S. § 5709.

5710 ("Grounds for entry of order"),[15] and 5712 ("Issuance of order").[16] These provisions

contain the mechanisms and requirements necessary to obtain a wiretap order.

---

[15] Section 5710 provides in relevant part as follows:

(a) Application.--Upon consideration of an application, the judge may enter an ex parte order, as requested or as modified, authorizing the interception of wire, electronic or oral communications anywhere within the Commonwealth, if the judge determines on the basis of the facts submitted by the applicant that there is probable cause for belief that all the following conditions exist:

(1) the person whose communications are to be intercepted is committing, has or had committed or is about to commit an offense as provided in section 5708 (relating to order authorizing interception of wire, electronic or oral communications);

(2) particular communications concerning such offense may be obtained through such interception;

(3) normal investigative procedures with respect to such offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ;

(4) the facility from which, or the place where, the wire, electronic or oral communications are to be intercepted, is, has been, or is about to be used, in connection with the commission of such offense, or is leased to, listed in the name of, or commonly used by, such person;

(5) the investigative or law enforcement officers or agency to be authorized to intercept the wire, electronic or oral communications are qualified by training and experience to execute the interception sought, and are certified under section 5724 (relating to training); and

(6) in the case of an application, other than a renewal or extension, for an order to intercept a communication of a person or on a facility which was the subject of a previous order authorizing interception, the application is based upon new evidence or information different from and in addition to the evidence or information offered to support the prior order,

regardless of whether such evidence was derived from prior interceptions or from other sources.

18 Pa.C.S. § 5710.

[16] Section 5712 provides in relevant part as follows:

(a) Authorizing orders.--An order authorizing the interception of any wire, electronic or oral communication shall state the following:

(1) The identity of the investigative or law enforcement officers or agency to whom the authority to intercept wire, electronic or oral communications is given and the name and official identity of the person who made the application.

(2) The identity of, or a particular description of, the person, if known, whose communications are to be intercepted.

(3) The character and location of the particular communication facilities as to which, or the particular place of the communication as to which, authority to intercept is granted.

(4) A particular description of the type of the communication to be intercepted and a statement of the particular offense to which it relates.

(5) The period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

**(b) Time limits.--**No order entered under this section shall authorize the interception of any wire, electronic or oral communication for a period of time in excess of that necessary under the circumstances. Every order entered under this section shall require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such communications not otherwise subject to interception under this chapter by making reasonable efforts, whenever possible, to reduce the hours of interception authorized by said order. In the event the intercepted communication is in a code or foreign language and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. No order entered under this section shall authorize the interception of wire, electronic or oral communications for any period exceeding 30 days. The 30-day period begins on the day on which the investigative or law enforcement officers or agency first begins to conduct an interception under the order, or

In 1994, this Court issued its decision in *Brion*, which held that the exception for

consensual interceptions set forth in the second exception in 5704 was unconstitutional

if the interception took place in the home of the non-consenting participant, absent prior

determination of probable cause by a neutral, judicial authority. *Brion*, 652 A.2d at 289.

In *Brion*, the Court indicated that this probable cause determination could be obtained by

the same methods for obtaining a wiretap order under Section 5708 and the sections

following thereafter (including that the determination be made by a judge of the Superior

Court). *Id.* Rather than following this recommendation, the General Assembly enacted

Section 5704(2)(iv), which provides that in addition to the requirements for a consensual

interception under Section 5704(2)(ii) quoted above, an in-home consensual interception

requires an order from the president judge of a court of common pleas based upon an

affidavit by an investigative or law enforcement officer that establishes probable cause

for the issuance of such an order. It provides:

> If an oral interception otherwise authorized under this
> paragraph will take place in the home of a nonconsenting
> party, then, in addition to the requirements of subparagraph
> (ii), the interception shall not be conducted until an order is
> first obtained from the president judge, or his designee who
> shall also be a judge, of a court of common pleas, authorizing

---

ten days after the order is entered, whichever is earlier. Extensions or renewals of such an order may be granted for additional periods of not more than 30 days each. No extension or renewal shall be granted unless an application for it is made in accordance with this section, and the judge makes the findings required by section 5710 (relating to grounds for entry of order).

**(c) Responsibility.--**The order shall require the Attorney General or the district attorney, or their designees, to be responsible for the supervision of the interception.

18 Pa.C.S. § 5712.

such in-home interception, based upon an affidavit by an investigative or law enforcement officer that establishes probable cause for the issuance of such an order. No such order or affidavit shall be required where probable cause and exigent circumstances exist. For the purposes of this paragraph, an oral interception shall be deemed to take place in the home of a nonconsenting party only if both the consenting and nonconsenting parties are physically present in the home at the time of the interception.

18 Pa.C.S. § 5704(2)(iv).[17]

Because Section 5704(2)(iv) requires an "order", and Sections 5709, 5710, and 5712 govern the issuance of orders for interceptions, we are faced with the question of whether the requirements contained therein apply to orders sought under both Sections 5704(2)(iv) and 5708, or conversely, only for nonconsensual order pursuant to Section 5708. This question is significant for present purposes because Sections 5709(3)(vi) and 5712(b) permit a court to issue a wiretap order to extend up to thirty days (with extensions upon application).

I begin by reiterating that Sections 5709, 5710, and 5712 follow immediately after Section 5708 and all four sections were contained in the initial Wiretap Act enacted in 1974. In contrast, Section 5704(2)(iv) was enacted decades later, in response to our 1994 *Brion* decision. Moreover, and more importantly, the requirements set forth in Sections 5709, 5710 and 5712 are fundamentally inconsistent with Section 5704(2)(iv). For example, Section 5709 requires that an application for a wiretap order include "[a] showing that there is probable cause to believe that such communication [related to crimes enumerated in Section 5708] will be communicated" at the location where the

---

[17] Section 5404(2)(iv) is the only subsection of Section 5704(2) that requires the procurement of an order of court.

interception is to take place. 18 Pa.C.S. § 5709(3)(iv). Likewise, Section 5710 provides that an order may be entered where a judge finds probable cause that, inter alia, the target of the interception has committed, or is about to commit, an offense as provided in [S]ection 5708[.]" 18 Pa.C.S. § 5710(a)(1). However, Section 5704(2)(iv) does not limit the broad grant of authority for consensual interception of communications by reference to the specific offenses listed in Section 5708. *See* 18 Pa.C.S. § 5704(2)(ii) (requiring that a consensual interception must involve "suspected criminal activities, including, **but not limited to**, the crimes enumerated in [S]ection 5708.") (emphasis added),

Likewise, pursuant to Section 5709, an order must be made "upon the personal oath or affirmation of the **Attorney General or a district attorney** of the county wherein the suspected criminal activity has been, is or is about to occur." Section 5704(2)(iv), by comparison, provides that an order authorizing a consensual in-home intercept may issue based only upon an affidavit by an **investigative or law enforcement officer** establishing probable cause of the suspected criminal activity. 18 Pa.C.S. § 5704(2)(iv). These requirements are inconsistent with each other and in conflict.

Section 5709 requires that the application for an order contain "a showing that there is probable cause to believe that the communication will be communicated on the wire communication facility or at the particular place where the oral communication is to be intercepted," 18 Pa.C.S. § 5709(3)(iv), and Section 5710 requires, for entry of an order, that the application must have shown that there is probable cause that "the person whose communications are to be intercepted . . . has or had committed . . . an offense provided in [S]ection 5708." 18 Pa.C.S. § 5710(a)(1). This requirement to establish probable cause makes sense in connection with a Section 5708 order, as that section standing

alone does not mention probable cause at all. By contrast, the requirement of probable cause is specifically referenced in 5704(2)(iv) – "the interception shall not be conducted until an order is first obtained from the president judge . . . based upon an affidavit of probable cause by an investigative or law enforcement officer that establishes **probable cause** for the issuance of such an order." 18 Pa.C.S. § 5704(2)(iv) (emphasis added).

All of these considerations drive my conclusion that Section 5704(2)(iv) is self-contained and is not governed by Sections 5709, 5710, and 5712. Section 5704(2)(iv) addresses a particular variation of consensual interception (in home), and all relevant requirements for that variety of interception are set forth within that section.

As I have determined that the provisions governing nonconsensual interception orders do not apply to Section 5704(2)(iv) orders, I would further conclude that a Section 5704(2)(iv) order may not be issued for a duration of thirty days. Unlike Section 5712(b) governing a Section 5708 order, Section 5704(2)(iv) does not authorize the issuance of an order for up to thirty days. 18 Pa.C.S. § 5712(b). A strict interpretation of this language, which we are required to perform, *Spangler*, 809 A.2d at 237, leads to the conclusion that a Section 5704(2)(iv) order is valid only for specific episodes.[18] If the

---

[18] Justice Mundy's Concurring Opinion argues that it conflicts with the statutory exceptions to require law enforcement to obtain a separate Section 5704(2)(iv) order for each entry into a private home for a consensual intercept. Concurring Op. at 3 (Mundy, J.).

Justice Mundy does not offer any detailed statutory interpretative analysis of the various provisions of the Wiretap Act in support of this contention, including no discussion of the substantial differences between Section 5704(2)(ii) and 5712(a) orders that preclude the "borrowing" of the Section 5712(b) time limits provision for application in the Section 5704(2)(ii) context. The General Assembly's clear intention in setting for the different requirements for obtaining a Section 5704(2)(ii) order, including the decision not to permit such orders to remain in place over an extended period of time, was to protect the

General Assembly wanted to authorize the duration of in-home interceptions to parallel Section 5712(b), it could have so stated when enacting Section 5704(2)(iv) by including the timeframe in the otherwise self-contained enactment.[19]

The affidavit of probable cause in this case specifically addressed a meeting between Katona and the CI that was to take place at eight in the evening on May 16, 2011. Thus, the order here was valid in so far as it authorized the interception of **that specific episode**. All subsequent interceptions were therefore unauthorized and illegal. When paired with my argument that the Independent Source Doctrine does not apply under these circumstances, I would conclude that the Superior Court must be reversed. I therefore respectfully dissent.

Justice Wecht joins this dissenting opinion.

---

constitutional rights of our citizens in their homes, not to minimize any "burdensome" and/or "impractical" requirements for law enforcement.

Justice Mundy's "plain language" reading of the relevant statutes is unconvincing, as it is based upon nothing more than the recognition that two words, "communications" and "contents," are stated in the plural on one or more occasions. Concurring Op. at 3 (Mundy, J.). From these plural words, Justice Mundy concludes that a single Section 5704(2)(ii) order may be used to intercept multiple exchanges over a thirty-day period, rather than a single episode. *Id.* A careful review of the statutory language at issue here, however, demonstrates that the singular and plural forms of these terms depends solely on the manner in which they are employed. Both Sections 5712(a) and (b), for example, which together permit orders issued thereunder to remain effective for up to thirty days, uses the term "communication" in both its singular and plural forms interchangeably. Moreover, Justice Mundy offers no support for her contention that "communications" (plural) and/or "contents" refer to multiple exchanges. A single conversation may include multiple communications, as each utterance by the members of the conversation may fairly be described as a separate "communication." Similarly, there may be multiple "contents" expressed in a single communication, depending, of course, on the nature and complexity of that communication.

[19] I note again that the General Assembly did not follow this Court's invitation to rely on the non-consensual wiretap provisions in the Wiretap Act.